UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN TYRONE IZAL HAIRSTON, CDCR #BF-2040,<br><br>Plaintiff,<br><br>v.<br><br>J. SALAZAR, N. RODRIGUEZ and F. AVILES,<br><br>Defendants. | Case No.: 22cv1800-WQH (KSC)<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, and**<br><br>**(2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff is a state prisoner proceeding *pro se* and *in forma pauperis* with a First Amended Complaint ("FAC") pursuant to 42 U.S.C. § 1983. (ECF No. 5.) Plaintiff claims the Defendants, correctional officers Salazar, Rodriguez and Aviles, used excessive force in restraining him after he attacked a correctional officer. (*Id*. at 4.) Currently pending are cross-motions for summary judgment. (ECF Nos. 70, 73.)

Plaintiff contends he is entitled to summary judgment because the video footage of the incident supports his allegations that Defendants used excessive force in violation of the Eighth Amendment. (ECF No. 70 at 2-4.) Defendants oppose Plaintiff's motion, arguing it is cursory and fails to satisfy the legal standard for granting summary judgment. (ECF No. 72 at 3-5.)

Defendants move for summary judgment in their favor, arguing: (1) Plaintiff has failed to exhaust administrative remedies as to Defendant Aviles, (2) there are no triable issues of material fact in dispute that force was used maliciously and sadistically rather than in a good faith effort to control an assaultive and resistive inmate, and (3) Defendants are entitled to qualified immunity because no reasonable officer in their position would have believed their actions violated the Eighth Amendment. (ECF No. 73 at 12-23.) Plaintiff has not filed an Opposition.

For the following reasons, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgment.[1]

## I. Exhaustion of Administrative Remedies

Defendant Aviles first moves for summary judgment with respect to exhaustion of administrative remedies, arguing it is undisputed that Plaintiff did not file an administrative grievance complaining that Aviles used excessive force during the June 21, 2022, incident as alleged in the FAC. (ECF No. 73 at 14.) Plaintiff has not filed an opposition.

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 578 U.S. 632, 635 (2016), quoting 42 U.S.C. § 1997e(a). The "exhaustion requirement does not allow a prisoner to file a complaint addressing non-exhausted claims." *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

Only when circumstances render administrative remedies effectively unavailable are inmates not required to exhaust administrative remedies. *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *see also Ross*, 578 U.S. at 648 ("The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'") There are "three kinds of circumstances in which an

---

[1] Although this motion was referred to United States Magistrate Judge Karen S. Crawford pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter. *See* S.D. Cal. CivLR 72.1(d).

administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross*, 578 U.S. at 643. They arise when: (1) the procedure "operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the process is "so opaque that it becomes, practically speaking, incapable of use;" and (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.

Once a defendant shows "there was an available administrative remedy, and that the prisoner did not exhaust that available remedy . . . the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). Any justifiable inferences drawn from the facts in the record are viewed in the light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendant Aviles presents the declaration of R. Blanding, the Grievance Coordinator at the Richard J. Donovan Correctional Facility ("RJD") and the custodian of records for non-health care appeals, who describes the inmate grievance procedures available to Plaintiff at RJD. (Blanding Decl. ¶¶ 1-4, ECF No. 73-6.) Blanding reviewed the records of inmate grievances filed between the date of the incident, June 21, 2022, and the date Plaintiff filed the FAC, February 13, 2023, and found no record of a grievance filed by Plaintiff regarding an excessive force complaint against Defendant Aviles. (*Id.* ¶¶ 9-10.)

Thus, Defendant Aviles has presented evidence in support of summary judgment that Plaintiff had available administrative remedies but did not file a grievance complaining that Aviles used excessive force on June 21, 2022. The burden has now shifted to Plaintiff "to come forward with evidence showing there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. Plaintiff has not attempted to do so. Defendant Aviles is therefore entitled to summary judgment with respect to exhaustion of administrative remedies. *See* Fed.R.Civ.P. 56(c) (a party is entitled to summary judgment when they show

"there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."); *Rhodes*, 621 F.3d at 1004 ("[T]he PLRA's exhaustion requirement does not allow a prisoner to file a complaint addressing non-exhausted claims.")

Defendant Aviles's motion for summary judgment based on Plaintiff's failure to exhaust available administrative remedies is **GRANTED**.

## II. Merits

Both parties seek summary judgment on the merits of Plaintiff's Eighth Amendment claim. Plaintiff argues that the allegations in the FAC along with the video footage of the incident and the video interview he underwent shortly after the incident showing his injuries, are sufficient to show he is entitled to summary judgment. (ECF No. 70.) He alleges in the FAC that on June 21, 2022, while incarcerated at RJD, he was involved in an altercation with correctional officer Williams. (ECF No. 5 at 4.) Defendant correctional officer Salazar "ran into the area, jumped over a desk and landed on top of Plaintiff." (*Id.*) Salazar and Defendant correctional officer Rodriguez held him down while Defendant correctional officer Aviles kicked and punched him numerous times while he was "completely defenseless." (*Id.*) Defendants then hit Plaintiff with their batons repeatedly while his hands were behind his back, and Rodriguez and Salazar "deliver[ed] knee blows to Plaintiff's body and back area." (*Id.*)

Plaintiff did not sign his FAC or his summary judgment motion under penalty of perjury, and the Court is therefore unable to consider any statements contained therein as evidence in support or opposition to summary judgment. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct.") The only evidence Plaintiff relies on in support of his motion is the video footage of the incident, the video footage of his interview immediately after the incident in which he shows and describes his injuries,

and presumably his deposition testimony containing his version of the events, all of which have been lodged by Defendants in support of their motion. As will be apparent, even were the Court to permit Plaintiff the opportunity to verify his FAC and motion papers, the outcome would not change.

Evidence presented by Defendants in support of their motion include their own declarations describing their involvement in the incident (ECF Nos. 73-2, 73-3, 73-4), and excerpts from Plaintiff's deposition. (ECF No. 73-1.) They also present the declaration of I.E. Taboada, the custodian of records for RJD, to which are attached as exhibits: (1) incident reports; (2) Plaintiff's medical report of injury; (3) video footage of the incident from two surveillance cameras and a body worn camera; (4) video footage of an interview with Plaintiff immediately after the incident; and (5) a copy of the Rules Violation Report issued against Plaintiff based on the incident resulting in a guilty finding of battery on an officer causing serious injury. (ECF No. 73-5.)

### A.  Legal Standards

A defendant is entitled to summary judgment if he or she shows "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing summary judgment is proper by "showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

To avoid summary judgment, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The Court may not weigh evidence or make credibility determinations, and any justifiable inferences drawn

from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id*. at 255. The nonmovant's evidence need only be such that a "jury might return a verdict in his favor." *Id*. at 257.

The Eighth Amendment "places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, "prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from . . . violent inmates." *LeMaire v. Maas*, 12 F.3d 1444, 1458 (9th Cir. 1993). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992), citing *Whitley v. Albers*, 475 U.S. 312 (1986).

**B.     Analysis**

In order to succeed on his Eighth Amendment claim, Plaintiff bears the burden of proof that the force used against him was not applied in a good faith effort to maintain or restore discipline but was applied maliciously and sadistically for the very purpose of causing harm. *Hudson*, 503 U.S. at 6. When determining whether force was excessive, the Court looks to the "extent of injury suffered by an inmate . . ., the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* at 7, quoting *Whitley*, 475 U.S. at 321.

**1.  Extent of injury**

Significant injuries are not required in the context of an excessive force claim because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. However, "[u]nder the *Whitley* approach, the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought

1 necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Id.* at 7, quoting *Whitley*, 475 U.S. at 321.

Defendants have presented a record of Plaintiff's medical examination conducted immediately after the altercation which reports no injuries, merely that Plaintiff complained of pain and that he had been exposed to a chemical agent for which he had been decontaminated by air rather than water. (ECF No. 73-5 at 14.) Plaintiff states in his deposition that he had a knot on his head where Salazar hit him with a baton. (ECF No. 73-1 at 11.) He states in the FAC that he "sustained injuries which pictures were taken when I did a video interview," but does not describe his injuries. (ECF No. 5 at 5.) A review of the video interview lodged by Defendants shows Plaintiff describing his injuries, including a small knot on his head, a scratch mark on his face and two on his ankle, and a bruise on his forearm and two on his back. (Taboada Decl. ¶ 8, Ex. 9, ECF No. 73-5 at 3.)

Defendants have carried their burden on summary judgment of showing there is no genuine issue of material fact in dispute that the injuries sustained by Plaintiff show "such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321; *see Hughes v. Rodriguez*, 31 F.4th 1211, 1221 (9th Cir. 2022) (holding that a dog bite to leg, abrasions on head and face, and bruising on thigh with no lasting complications were not substantial injuries under *Whitley*). Plaintiff has not carried his burden in opposition of identifying evidence such that a jury might return a verdict in his favor with respect to a finding whether the injuries he sustained show the use of force evinced such wantonness of unjustified infliction of harm as tantamount to a knowing willingness that it occur. *Anderson*, 477 U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted). Plaintiff has not carried his burden on his summary judgment motion of showing he is entitled to judgment as a matter of law on this element. *Adickes*, 398 U.S. at 157.

## 2. The need for application of force

With respect to the need for application of force element of the Eighth Amendment excessive force inquiry, Plaintiff admitted in his deposition that he initiated the physical altercation with officer Williams:

> I attacked Williams. I attacked him. And then he tried to fight back, but the fight didn't last for, like, ten seconds. And then they dragged him out of the building. And once they dragged him out of the building, they put him -- I guess he went to the hospital or something like that. They said he had a concussion.
>
> But after the altercation with me and the officer, he was already, like, already knocked out. And they had to get him out of the building. And Rodriguez tackled me and put me on the ground. And he said, man, it's done, Hairston, like, it's over.
>
> And then he was on my back with my hands behind my -- I was on my stomach with my hands behind my back and Rodriguez had his -- had my hands behind my back. But he didn't cuff me up at this time. So he [is] just sitting on me with my hands behind my back.
>
> And there's a lady officer, I forgot her name, but she had my legs, like, secured. So I was right there on the ground waiting for the responding staff to get in the building, to handcuff me and send me on my way.
>
> So when they run in the building, they just jumped on me, started handcuffing me, locking all the inmates up in the dayroom. They just jumped on me. And they worked on me for like 10 seconds. And -- like 10 or 15 seconds. And after that, once I realized that it wasn't going to stop, I started engaging back with them because I thought I was going to die.
>
> So I started back fighting with all of the officers. And that's just what happened. And after that they took me on my way, and that's how all this came about.

(ECF No. 73-1 at 13-14.)

In that passage it appears Plaintiff claims there was no need for the use of force whatsoever, as he had submitted to be restrained after the fight with Williams had ended and only began fighting with the responding officers after they "jumped on me" and

"worked on me for" ten or fifteen seconds, after which he began to think he was going to die if he did not fight back.

Defendants point out that later in his deposition Plaintiff contradicted that version of events when he said:

> So what happened was after I knocked him down, after I knocked him out, when I seen he was knocked out on the ground, I stood -- I went over there and stood over his body. And I stood over him, and I started beating him up some more while he was already knocked out on the ground. He was already knocked out and completely unconscious. And I went over, and I stood over him, and I start, you know, punching him some more.
>
> So after that, that's when Rodriguez said, Hariston, that's enough. It's over with. That's enough. It's already over. That's enough. Then that's when he tackled me. Rodriguez tackled me on the ground because I wouldn't stop beating up Williams.

(*Id*. at 9.)

Thus, by Plaintiff's own testimony there was a need for the use of force to stop him from continuing to assault officer Williams after he was unconscious because Plaintiff did not heed Rodriguez's verbal request to stop. The only potential issue in dispute with respect to the "need for application of force" prong of the Eighth Amendment inquiry is whether once Plaintiff was taken to the ground and was on his stomach with Rodriguez holding his hands behind his back and a female officer holding his legs, the force used for the next ten or fifteen seconds was unnecessary and it precipitated Plaintiff needing to fight back, or if the use of force after he was taken to the ground was necessary because he continued to struggle and fight as described by Defendants in their declarations and as they contend is seen in the video footage.

Defendants argue the video footage shows Plaintiff, without provocation, lunging towards Officer Williams and punching him in the face several times; Rodriguez then pulls Plaintiff off Williams and takes Plaintiff to the ground; as Rodriguez brings Plaintiff to the ground, Plaintiff is seen kicking Officer Williams; Rodriguez and responding staff then struggle to gain control of Plaintiff as he thrashes his body from side to side on the ground;

Salazar is seen running into the building, jumping over a desk, landing near Plaintiff, positioning his body on top of Plaintiff, and striking him a single time with his left forearm; Aviles is seen entering the building as multiple officers on the ground continue to struggle with Plaintiff; Aviles is then seen positioning himself on top of Plaintiff and striking him with his pepper-spray can; Rodriguez is seen holding Plaintiff against the ground until responding officers place him in handcuffs and he is escorted out of the building by Rodriguez and other responding officers. (ECF No. 73 at 17.) To the extent the Plaintiff is visible in the video footage from the stationary surveillance cameras (Taboada Decl. ¶ 6, Exhibits 6-7, ECF No. 73-5 at 2), the footage generally corroborates the description provided by Respondent. Plaintiff is not seen to be struck or hit after he is subdued and stops struggling. (*Id*.) The body worn camera footage shows the officer who is wearing the camera arrive after the altercation has occurred and Plaintiff has been subdued. For the brief moment that the body worn camera footage shows Plaintiff, it does not show Plaintiff being struck or hit. (Taboada Decl. ¶ 7, Exhibit 8, ECF No. 73-5 at 2-3.)

Defendant Aviles states in his declaration that on June 21, 2022, at approximately 8:00 p.m., after hearing "Assault Staff Housing Unit 14" broadcast on his radio, he responded to housing unit 14 and observed multiple officers on the ground attempting to restrain Plaintiff. (Aviles Decl. ¶ 2, ECF No. 73-2.) Plaintiff was actively resisting by punching officers, thrusting his body from side to side, and trying to get up. (*Id*.) Aviles observed officers Rodriguez, Salazar, Contreras and Clay struggling with Plaintiff while trying to place him in handcuffs and leg restraints. (*Id*. ¶ 3.) Aviles grabbed Plaintiff's right arm and tried to put it behind his back but was unable to do so. (*Id*.) He states that: "To prevent Hairston from injuring me or other responding staff, I used multiple hammer strikes with my pepper-spray can against Hairston's right shoulder, which did not deter him." (*Id*. ¶ 4.) After he observed another officer successfully handcuff Plaintiff, Aviles turned his attention to inmate Phillips who was yelling threats and refusing orders to get down. (*Id*. ¶ 5.) Aviles discharged one pepper-spray blast grenade toward Phillips which was effective, and he had no further interaction with Plaintiff. (*Id*. ¶¶ 6-9.)

/ / /

Defendant Rodriguez states that he observed Plaintiff arguing with officer Williams when Plaintiff "suddenly and repeatedly punched officer Williams in the face." (Rodriguez Decl. ¶ 2, ECF No. 73-3.) Rodriguez observed officer Rubio deploy pepper spray which failed to stop the assault on Williams, and Rodriguez feared for Williams's safety because Plaintiff is "a very physically fit, muscular individual." (*Id*. ¶ 3.)

Rodriguez states:

> To stop Hairston's attack, I approached him from behind with the intent of intervening. At that time, both Hairston and Williams were standing, with Hairston continuing to swing at Williams, while Williams was attempting to use his arms to create separation distance and hold-off Hairston's punches. I pulled Hairston away from Williams and forced him to the ground using arms and body weight. As we went to the ground, Hairston resisted my attempt to restrain him by pulling his body away from me, kicking me and other responding officers, and thrashing his body from side to side. Once Hairston was on the ground, he continued to resist me and responding officers by kicking us and thrashing his body from side to side. I held Hairston against the ground using my arms and body weight on top of him so that responding officers could place him in restraints. After a brief struggle, responding officers placed him into handcuffs. Myself and another officer then assisted Hairston to his feet and escorted him to Facility C Gymnasium, where we offered him running water to cleanse himself from pepper-spray used during the incident. Two other officers then secured Hairston in a holding cell. I did not have any further interaction with Hairston on June 21, 2022. I never punched, kicked, or hit Hairston with any kind of instrument during the incident on June 21, 2022. I only used my arms and body weight to attempt to gain control of him during his attack on Williams.

(*Id*. ¶¶ 4-10.)

Defendant Salazar states in his declaration that:

> While performing my duties as RJD's Facility C, Housing Unit 15, Floor Officer on June 21, 2022 at approximately 8:57 p.m., I heard "Code 1, staff assault, housing unit 14" over my state-issued radio. I immediately ran towards Housing Unit 14 to assist with responding to the situation and securing the facility. When I entered the building, I saw multiple officers on the floor behind a desk, struggling to restrain inmate Kevin Hairston, who was resisting officers by kicking them and thrashing his body from side to side. I

jumped over an officer on the ground and landed next to Hairston. In my report of the incident I stated that I landed on Hairston, but review of video footage from a camera in the dayroom shows that I landed near him and then moved on top of him. My moving on top of Hairston was done to stop his assault on staff and gain control of him. I attempted to pin him against the floor using my body weight. To stop Hairston's assaultive conduct toward staff and gain control of the situation, I struck him on the right side of his face with my left forearm, but that did not stop him as he kept trying to get up from off the floor. Given my proximity to him and his thrashing movements, it was difficult for me to gain control of his body or otherwise restrain him. Hairston punched me on the left side of my head multiple times. I immediately felt pain. Hairston then grabbed the collar of my shirt and pulled me down towards the floor. I then felt Hairston release my uniform. Hairston continued to resist staff and rolled onto his stomach. To restrain Hairston and stop his attack, I placed my knee on his back and held him against the floor. I noticed inmate Phillips standing several feet away from the altercation, with his fist clinched, shouting profanities and threats at staff. I was concerned that inmate Phillips could potentially attack staff, who were focused on responding to Hairston's assault and resistive behavior. I made eye contact with Phillips, verbally commanded him to maintain his distance and move away, and when he refused to step back, deployed a single burst of pepper spray from my state-issued Mk-9 canister toward him from approximately 10 feet away. My deployment of pepper spray did not stop his threatening physical or verbal actions. Once responding staff managed to secure Hairston in handcuffs, I focused my attention towards the rest of the inmates on the dayroom floor.

(Salazar Decl. ¶¶ 2-9, ECF No. 73-4.)

Salazar states that he then assisted Aviles in subduing inmate Phillips and had no further interaction with Plaintiff. (*Id*. ¶¶ 11-14.) He states: "I never punched, kicked or hit Hairston with any kind of instrument during the incident on June 21, 2022." (*Id*. ¶ 15.)

By Plaintiff's own admission in his deposition, the initial use of force by Rodriguez was necessary to prevent Plaintiff from continuing to assault officer Williams. With respect to the use of force once Plaintiff was taken to the ground, Defendants contend their evidence contradicts Plaintiff's version that he only began fighting after the responding officer "worked on" him for ten or fifteen seconds.

Although the Court may not make credibility assessments regarding the Defendants'

version of the events in their declarations and Plaintiff's version in his deposition (which as noted is, along with the video footage, the only admissible evidence relied on by Plaintiff), a review of the video footage and Plaintiff's deposition demonstrates that Defendants have carried their burden of showing the absence of a genuine issue as to any material fact that force was necessary to: (1) stop Plaintiff from assaulting Williams and from continuing to assault Williams; (2) stop Plaintiff from assaulting Rodriguez while Rodriguez was attempting to restrain Plaintiff; and (3) restrain Plaintiff and prevent him from assaulting the officers who were attempting to restrain him. With respect to the "need for application of force" prong of the Eighth Amendment inquiry, to avoid summary judgment Plaintiff must identify evidence such that a "jury might return a verdict in his favor" with respect to whether the use of force against him by Defendants was necessary. *Anderson*, 477 U.S. at 257. He has failed to carry that burden by relying on the video footage, his deposition, and the allegations in the FAC—even were they verified. He has also failed to carry his burden on his own summary judgment motion of showing he is entitled to judgment as a matter of law on this element of an Eighth Amendment claim. *Adickes*, 398 U.S. at 157.

### 3. The relationship between the need for application of force and the amount of force used

Defendants have shown there is no genuine issue in dispute that force was needed to stop Plaintiff from continuing to assault officer Williams and to stop him from assaulting the responding officers. Defendants have also shown there is no genuine issue in dispute that the amount of force used, which was brief, did not inflict significant injuries on Plaintiff, and was necessary to stop him from assaulting staff, was proportional to that need. *See LeMaire*, 12 F.3d at 1458 ("[P]rison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from such violent inmates.") Plaintiff has not carried his burden of opposing Defendants' motion with respect to this inquiry, as his reliance on the video footage and description of the events in his deposition are insufficient to identify evidence

which might permit a jury to find that the relationship between the need for the use of force and the amount used could give rise to an inference force was not applied in a good faith effort to maintain or restore discipline but was applied maliciously and sadistically for the very purpose of causing harm. *Hudson*, 503 U.S. at 6; *Anderson*, 477 U.S. at 256-57. Plaintiff has failed to carry the burden on his own summary judgment motion of showing he is entitled to judgment as a matter of law on this element. *Adickes*, 398 U.S. at 157.

### 4. The threat reasonably perceived by the responsible officials

Plaintiff admits he posed a serious threat to officer Williams by continuing to assault him after he had rendered Williams unconscious. That evidence, supported by the video footage, shows the responding officers reasonably perceived that Plaintiff constituted a threat of ongoing assault, particularly because Plaintiff admits he continued to assault Williams and admits he ignored Rodriguez's verbal request to stop, and because the video footage shows Plaintiff assaulting Rodriguez when he attempted to stop Plaintiff's assault on Williams. The video footage shows Plaintiff struggle and resist after the responding officers attempted to subdue him. Plaintiff does not dispute Defendant Rodriguez's statements, which are supported by the video footage, that officer Rubio deployed pepper spray against Plaintiff which failed to stop the assault on Williams and that Rodriguez feared for Williams's safety because Plaintiff is "a very physically fit, muscular individual." (Rodriguez Decl. ¶ 3, ECF No. 73-3.)

Defendants have carried their burden of showing there is no genuine issue of material fact in dispute that they reasonably perceived a serious threat posed by Plaintiff. The burden has shifted to Plaintiff to identify some evidence from which a jury might find the Defendants did not reasonably perceive a threat. He presents only his deposition testimony stating that he ignored Rodriguez's verbal request to stop assaulting Williams and began assaulting Rodriguez but immediately stopped fighting or struggling as soon as Rodriquez had him on the ground on his stomach with the female officer on his legs, and it was only after they "worked on" him for ten or fifteen seconds that he began to fight back. That deposition testimony is not supported by the video footage as Plaintiff maintains. In any

case, even if Plaintiff could convince a jury that he was struck after the officers were on top of him and he had stopped resisting, in light of his other actions, particularly the unprovoked attack on Williams which necessitated Rodriguez's intervention, precipitated Plaintiff assaulting Rodriguez, and necessitated the response by the other officers, Plaintiff could not identify evidence that Defendants did not reasonably perceive a threat. By Plaintiff's admission the officer's actions were necessary to subdue him. Plaintiff's contention that he briefly stopped struggling is insufficient to carry his burden of identifying evidence from which a jury might find the Defendants did not reasonably perceive he posed a threat even after he allegedly stopped struggling, which is not supported by the video evidence. Plaintiff has likewise failed to carry the burden on his own summary judgment motion of showing he is entitled to judgment as a matter of law on this element. *Adickes*, 398 U.S. at 157.

### 5. Any efforts made to temper the severity of a forceful response

The final inquiry into whether the force used was applied maliciously and sadistically for the very purpose of causing harm or in a good faith effort to restore order is whether the Defendants made any efforts to temper the severity of their response. According to Plaintiff's deposition testimony, Defendant Rodriguez told Plaintiff: "that's enough. It's over with. That's enough. It's already over. That's enough. Then that's when he tackled me. Rodriguez tackled me on the ground because I wouldn't stop beating up Williams." (ECF No. 73-1 at 9.) Thus, Plaintiff admits Rodriguez attempted to resolve the situation without force and admits it was only after he refused Rodriguez's order to stop beating on Williams that Rodriguez first resorted to the use of force by taking Plaintiff to the ground. Although Plaintiff also said Rodriguez was holding his hands behind his back with the female officer on his legs and he was fully compliant with no need for the other officers to use any force (*id.* at 9-10), the video footage, relied on by Plaintiff, does not show Plaintiff being struck after he was compliant or after he stopped resisting being subdued.

Defendants have come forward with evidence that Rodriguez attempted to subdue

Plaintiff without force and then with a minimal amount of force, but Plaintiff continued struggling and assaulting the officers. It was only then that other officers responded and only to the extent necessary to subdue Plaintiff. Defendants have carried their burden of showing there is no genuine issue of material fact in dispute that they made efforts to temper the severity of their use of force, and Plaintiff has not carried his burden in opposition of identifying evidence which might permit a jury to find in his favor as to this element of his claim. *Anderson*, 477 U.S. at 256-57. Neither has he carried his burden on his own summary judgment motion of showing he is entitled to judgment as a matter of law on this element. *Adickes*, 398 U.S. at 157.

### 6. Conclusion

As noted above, "prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from such violent inmates." *LeMaire*, 12 F.3d at 1458. "[O]fficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Hudson*, 503 U.S. at 6 (observing that "corrections officials must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'"), quoting *Whitley*, 475 U.S. at 320. "When weighing the merits of excessive force claims, we have interpreted *Hudson* to stand for the proposition that prison staff should be 'accorded wide-ranging deference.'" *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020), citing *Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012), quoting *Hudson*, 503 U.S. at 6. "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.

Applying those standards, Defendants have carried their burden on summary judgment of demonstrating there is no genuine issue of material fact in dispute which could establish that the force used on Plaintiff was applied maliciously and sadistically for the

very purpose of causing harm rather than in a good-faith effort to restore discipline. Plaintiff has not carried his burden in opposition to Defendants' motion or on his own summary judgment motion. Accordingly, Plaintiff's motion for summary judgment on the merits of his Eighth Amendment excessive force claim is **DENIED**. The motion for summary judgment on the merits of Plaintiff's Eighth Amendment excessive force claim by Defendants Rodriguez, Salazar and Aviles is **GRANTED**.

### III.  Qualified immunity

Defendants claim entitlement to qualified immunity on the basis that no reasonable officer would have known that responding with force in the manner they did would be a violation of Plaintiff's constitutional rights. (ECF No. 73 at 22-23.) Because Defendants are entitled to summary judgment on other grounds, the Court declines to address qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.")

### IV.  Conclusion and Orders

Based on the foregoing, **IT IS ORDERED** that:

1. Plaintiff's motion for summary judgment [ECF No. 70] is **DENIED**.
2. Defendants' motion for summary judgment [ECF No. 73] is **GRANTED** as to the exhaustion of administrative remedies with respect to Defendant Aviles and as to the merits of Plaintiff's Eighth Amendment excessive force claim as to all Defendants.

The Clerk of Court is directed to enter final judgment in favor of all Defendants.

**IT IS SO ORDERED.**

Dated:  November 18, 2024

Hon. William Q. Hayes
United States District Court